OPINION OF THE COURT
Manuel J. Mendez, J.
Plaintiff brings this breach of contract action to recover unpaid premiums in the amount of $17,521.87 inclusive of interest and 22% collection fees. Defendant asserts that no money is owed because he made the required payments prior to the policy cancellation and additionally, pursuant to Workers’ Compensation Law § 2 (3) and (4), he is self-employed and not an employer or employee subject to the mandatory insurance requirements of the Workers’ Compensation Law.
This matter was tried by the court on January 23, 2004, at which time both parties had a full opportunity to present evidence in support of their respective positions. Plaintiff presented as a witness Ms. Attracta Roche, an underwriter. Defendant testified on his own behalf. In addition, both parties introduced documentary evidence. Plaintiff introduced an application for insurance (exhibit 1), a workers’ compensation and employers’ liability insurance policy containing terms and conditions (exhibit 2), and a computerized statement of accounts dated January 10, 2002. Defendant introduced a bill from the State Insurance Fund in the amount of $3,495.74 covering the period from August 21, 2000 through October 23, 2000 (exhibit A) and a letter dated June 3, 2001, disputing the amount billed and requesting an audit (exhibit B).
Factual Background
On May 20, 1999, plaintiff received an application for New York workers’ compensation and employers’ liability insurance policy from defendant Bernard Branicki. The policy of insurance was issued on May 21, 1999. The application contained a statement from defendant that he operated a painting business and had a payroll of $10,000.[1] At the time of issuance of the policy an initial determination of premium was made based on the amount declared as “payroll” in the application. Thereafter, *974 an audit was performed on a quarterly basis to determine actual premiums.
In order for plaintiff to perform an audit, defendant must provide access to his books and records in accordance with part 4, section H of the policy’s terms and conditions.[2] In the event the plaintiff is unable to perform an audit, then the premiums are estimated based on a formula.[3] The policy in question was in effect for a period of two years, 1999 and 2000.
Plaintiff was able to perform two audits of defendant’s books and records. These audits revealed that defendant had no employees and had a payroll of only one dollar. There is nothing in the record as to when these audits were performed or whether the amount billed as premiums are a result of these audits.
Plaintiff did not perform further audits of defendant’s books, nor make any written requests that defendant produce his books and records for auditing. In August of 2000, plaintiff presented defendant with an estimated bill for premiums in the amount of *975 $3,495.74. Upon receiving this bill, defendant called a “hotline” established by the plaintiff for those insured that are requesting an audit. According to his testimony at trial, the defendant called this telephone number many times but an audit was never conducted. Finally, on June 3, 2001, he wrote a letter to the plaintiff addressed to its audit department, requesting that an audit be performed.[4]
The defendant made his last payment on the policy on July 19, 2000. The policy was cancelled on September 26, 2000. Before cancelling, the plaintiff billed defendant $3,495.74 in August of 2000 to cover the period August 21, 2000 to October 23, 2000. After cancellation, the plaintiff billed the defendant $2,959.26 on November of 2000, $3,795.62 on May 31, 2001 and $4,111.57 on June 1, 2001. There has been no explanation as to how these figures were obtained.
Consequently, the issues before this court are whether a contract existed between the plaintiff and defendant; whether there was a breach of that contract; whether the plaintiff is entitled to collect estimated premiums and what is the amount of damages, if any?
Legal Analysis
The requirements for the formation of a contract are that at least two parties with legal capacity to contract, mutually assent to the terms of the contract, and that there is consideration (see Restatement [Second] of Contracts §§ 9, 12, 17; 1 Lord, Williston on Contracts § 3:2, at 200-209 [4th ed]; 22 NY Jur 2d, Contracts §§ 11, 13).
In this case, we have at least two parties with legal capacity to contract. These parties have assented to the terms of the contract insofar as the defendant completed and presented an application for insurance and the plaintiff issued a policy, along with its terms and conditions. The premium paid is consideration for the insurance coverage. Therefore, the court finds that there was a contract of insurance between the parties, subject *976 to the principles of contract interpretation (see, Matter of Covert, 97 NY2d 68 [2001, Ciparick, J.]).
The elements of a cause of action for breach of contract are the formation of a contract between plaintiff and defendant, performance by plaintiff, defendant’s failure to perform, and resulting damage (see, Furia v Furia, 116 AJD2d 694 [2d Dept 1986]).
Based on the records before it, the court finds that there was a contract between plaintiff and defendant. Plaintiff complied with the terms of the contract by issuing a policy of insurance and providing coverage up to September 26, 2000, the date of cancellation for nonpayment of premiums. Defendant breached that contract when he failed to pay all the premiums. As a result of defendant’s nonpayment of premiums, plaintiff sustained damages, and the policy was properly cancelled (see DeStefano v State Ins. Fund, 43 AD2d 180 [1973]; Rigaud v Rappoport, 42 AD2d 666 [1973]).
Is Plaintiff Entitled to Estimated Premiums
Although it has been clearly established that there was a breach of contract by defendant, plaintiff has not demonstrated its entitlement to the amount sued for. Other than a computer printout which is conclusory in nature, plaintiff has not provided any evidence as to how it arrived at the figures in the printout or whether these figures were based on actual or estimated audits. Consequently, it has been left to the court to determine the premium amount due the first year the policy was in effect as well as the amount due on the second year of the policy.[5] It has also not been established that plaintiff requested defendant’s books and records for an audit or that defendant refused to provide access to the books.[6]
*977 In accordance with Workers’ Compensation Law § 95, “Every employer who is insured by the State Insurance Fund shall keep a true and accurate record on the number of his employees and the wages paid by him, and shall furnish upon demand a sworn statement of the same” (see Workers’ Compensation Law § 95 [emphasis added]). The plaintiff did not “demand” that defendant provide it with its records or a sworn statement of the same. The only testimony on this issue comes from the defendant who maintains that he requested an audit on numerous occasions by calling a hotline and that one was never conducted. Defendant even went as far as writing a letter requesting an audit, to no avail. The only response from the plaintiff was to bill defendant in the amount of $14,362.19 based on estimated premiums and charges.
Where there is no basis for finding that the defendant failed to maintain proper records or refused to provide plaintiff with access to the appropriate records, plaintiff is not entitled to recover estimated workers’ compensation insurance premiums (see Commissioners of State Ins. Fund v D & M Leasing, 259 AD2d 271 [1st Dept 1999]).
In support of their position, plaintiff cites Commissioners of State Ins. Fund v Global Distribs. (NYLJ, Feb. 24, 1992, at 35, col 5). That case is distinguishable from the facts of this case. In Global Distribs., defendants refused to allow the State Insurance Fund access to its books and records, forcing it to rely on its estimates in computation of premiums. Furthermore, in Global Distribs., a formal demand for the records was made. Here no such request has been made and there is no evidence that defendant has refused access to his records. In fact, the evidence is completely to the contrary.
Thus, to allow plaintiff to recover estimated premiums under the facts of this case would be tantamount to rewarding it for its failure to comply with its obligation under the law, while at the same time punishing defendant for making its books and records readily available for inspection by plaintiff. Such is not the intended or desired result. Plaintiff is permitted to estimate its premium on the policy it issues, precisely to entice defendant to comply with the law and make his books and records available, since the estimated premium will almost always be much higher than the premium based on an audit. This court finds *978 persuasive the rationale of the First Department in D & M Leasing where the Court set forth when an insurance company is entitled to recover estimated premiums (see Commissioners of State Ins. Fund v D & M Leasing, supra).
Amount of Damages
To ascertain the amount of damages sustained, this court has only the statement of account submitted in evidence. A reading of this document reveals that during the year 1999, the premium on the policy was $1,630. This amount was obtained by adding all of the charges billed during this year.[7]
Using the formula provided by plaintiffs witness, the court may calculate the premium due on the policy had an audit been accomplished in 2000 as follows: Payroll $10,000 + 10% = 11,000 x manual rate (13.37%) = 147,070/100 = 1,470.70 + territorial charge (13.5%) 198.45 + penalty (31%) 455.72 + assessment charge (13.6%) 199.92 = $2,324.16. This amount was due on May 25, 2000 and would allow for insurance coverage through May 21, 2001.
Workers’ compensation insurance premiums for any policy period shall be paid into the insurance fund in three installments which are payable when due (Commissioners of State Ins. Fund v J.D.G.S. Corp., 253 AD2d 368 [1st Dept 1998]). The first installment shall be paid at the beginning of the period. The second installment three months after the beginning and the third installment six months after the beginning of the period (see Workers’ Compensation Law § 92).
*979 At the beginning of the policy period defendant owed plaintiff $1,162.12 which is 50% of the policy premium plus any outstanding balance from the previous year. According to the statement of account in evidence, there was an outstanding balance from 1999 in the amount of $29.88. This makes the total due by defendant on May 2000, $1,192.
The policy was in effect for five months until it was cancelled for nonpayment of premiums. The policy of insurance calls for a calculation of final premium pro rata based on the time the policy was in force.[8] The obvious equitable way of fixing the amount is to charge defendant the premium for the full term and then deduct therefrom the amount of the unearned premium on a pro rata basis (see, Commercial Cas. Co. of Newark, N.J. v Rice, 93 Misc 567 [1916]). Defendant owed $2,324.25 for the full year or $193.68 per month. The policy was in effect five months. Therefore, defendant owed plaintiff at the time of cancellation $968.44 in premiums, for year 2000 and an additional $29.88 from year 1999 for a total of $998.31. On July 19, 2000, defendant made a payment of $650, leaving an outstanding balance of $348.31.
Conclusion
The court grants judgment to plaintiff, State Insurance Fund, in the amount of $348.31 plus statutory interest and a 22% collection fee charge pursuant to State Finance Law, article 2, § 18 (4) and (5).

. Application for New York workers’ compensation and employers’ liability insurance in evidence as plaintiffs exhibit 1. Stamped received by the State Insurance Fund on May 20, 1999 at 2:15 P.M. Lists applicant as “sole proprietor/self-employed.” Item (21) lists estimated annual payroll $10,000. Dated and signed by defendant Bernard Branicki.

. Workers’ compensation and employers’ liability policy in evidence as plaintiffs exhibit 2. Part 4, section H — Audit: “You will let us examine and audit all your records that relate to this policy whether the records pertain to the current policy period or to any previous policy period. These records include ledgers, journals, registers, vouchers, contracts, tax reports, payroll and disbursement records and programs for storing and retrieving data. We may conduct the audits during regular business hours during the policy period and within three years after the policy period ends. Information developed by audit will be used to determine final premium. Insurance rate service organizations have the same rights we have under this provision.”

. Plaintiffs witness testified that there was a formula for computing estimated premium which is: Payroll x 10 = estimated premium. Furthermore, the State Insurance Fund uses a range to establish estimated payroll. Normally they would use the high end of the range. For the years in question the ranges were:
Year Minimum Maximum
1999 19,500 to 58,500
2000 20,800 to 62,400
The formula for computing premium based on audit is:
[Year 1999]
Payroll x manual rate plus constant rate x assessment charge = premium. 100
[Year 2000]
Payroll x 10% x manual rate plus constant rate x assessment charge x short 100 penalty rate x territorial charge = premium.
In 1999, manual rate = 13.16% and assessment charge = 9.4%.
In 2000, manual rate = 13.37% territorial charge = 13.5% short rate penalty = 31% assessment charge = 13.6%.

. Defendant’s exhibit B in evidence. Handwritten letter addressed to the audit department of the State Insurance Fund at 199 Church Street, New York, New York 10007, dated June 3, 2001 and signed by defendant. Contents of letter: “My name is Bernard Branicki. I received bill from insurance office to pay $3379.62. Me have no employee or employment. Please send someone to check. No employment. Business bad. I call your office 6 time. Woman said somebody to come to check the employment. No employment. Nobody come. Signed.”

. After the conclusion of the trial, the court held a conference with the attorneys for the respective parties. At the conference, the court requested clarification from plaintiffs counsel on the issue of premiums. In particular the court needed to know the following: (a) What was the premium for the first year based on the audits that were conducted, and (b) What would have been the premium for the second year based on the same audits?
This conference was held on Thursday, January 29, 2004. Counsel for the plaintiff was to have an answer by the following day. The answer to these questions was never received by the court.

. There was no testimony from plaintiffs witness as to why the State Insurance Fund did not perform the audits. There is no indication any demand was made for the production of defendant’s books and records or that anyone appeared at his place of business to perform an audit. The only evidence on *977 the record is that two audits were done and for unknown reasons no other were performed. Subsequently, the bills were based on estimated premiums.

 June 9, 1999 $ 800.00 June 9, 1999 $ 88.89 June 21, 1999 $ 88.89 June 21, 1999 $ 10.00 July 21, 1999 $ 88.89 July 21, 1999 $ 10.00 August 23, 1999 $ 88.89 August 23, 1999 $ 10.00 September 21, 1999 $ 88.89 October 21, 1999 $ 88.89 November 22, 1999 $ 88.89 December 21, 1999 $ 88.89 January 21, 2000 $ 88.88 $1,630.00

. Workers’ compensation and employers’ liability policy in evidence as plaintiffs exhibit 2. Part 4, section F — Final Premium: “If this policy is cancelled, final premium will be determined in the following way, unless our manual provides otherwise: (1) if we cancel, or you cancel because you are no longer [required] by law to have insurance, final premium will be calculated pro-rata based on the time this policy was in force. Final premium will not be less than the pro-rata share of the minimum premium.”